Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 CR 589-4 | **DATE** | 7/10/2001 |
| **CASE TITLE** | United States of America vs. Jason Louis Libson | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]  Enter Memorandum Opinion and Order. Defendant Libson's motion to suppress (Doc. 49-1) is denied. Motion to Quash the arrest (Doc. 50-1) is denied and motion to suppress (Doc. 50-2) is denied as moot, Defendant having failed to identify any statements he believes should be suppressed.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | ┘ number of notices | Document Number |
|---|---|---|---|---|
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | JUL 1 0 2001 date docketed | 73 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 7/9/2001 | |
| | Copy to judge/magistrate judge. | LAW OFFICE DOCKETING 01 JUL 10 AM 11: 11 | date mailed notice | |
| ETV | courtroom deputy's initials | Date/time received in central Clerk's Office | ETV mailing deputy initials | |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | No. 00 CR 589-4 |
| JASON LOUIS LIBSON, | ) ) | Judge Rebecca R. Pallmeyer |
| Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

On the morning of November 7, 2000, federal agents entered the apartment occupied by Defendant Jason Libson and seized evidence of Libson's involvement in a counterfeit check scheme. Following the entry and search, agents of the Immigration and Naturalization Service ("INS") took Libson into administrative custody. The next day, Libson was arrested by the Federal Bureau of Investigation and charged in a fraud scheme. Libson argues that the agents' entry on November 7 violated the Fourth Amendment and moves to suppress the evidence. The court heard the testimony of Libson and several agents at a hearing conducted on April 25 and April 30, 2001. For the reasons set forth below, the motion is denied.

## FACTS

Law enforcement officers from two different federal agencies arrived at Libson's apartment at approximately 7:00 a.m. on November 7. (T. 156.)[1] Two INS agents were there to determine whether Libson was the same individual identified in records as an

---

[1] All references are to the transcript of testimony heard on April 25 and April 30, 2001.

"overstayer" under the Visa Waiver Pilot Program, subject to immediate removal from the United States. (T. 113.) Agents of the FBI suspected that counterfeit checks were being produced in Libson's apartment and wanted to question him about that matter. (T. 156.) A security officer at Libson's building allowed INS Agent Hart and FBI Agent Klimas to enter the building from the lobby (T. 138); they went to Libson's twelfth floor apartment and knocked on the door. (T. 116, 139.) When he did not answer, Klimas used his cell phone to call additional FBI agents who were waiting in the lobby downstairs and asked them to telephone Mr. Libson. (T. 160.) FBI Agent Osborne called Libson from the lobby and explained that there were federal agents at his apartment door. (T. 79, 96, 160-61, 207.) After receiving this call, Libson made his way to the apartment door, where he allowed Klimas and Hart access, approximately ten minutes after their arrival. (T. 161, 208.)

Hart identified himself as an immigration agent and asked to see Libson's identification and travel documents. (T. 117, 118.) Libson told Hart he could not remember where the documents were, or even whether they were in the apartment. (T. 121-122, 143.) On Hart's request, Libson agreed to sign a consent to search form. (T. 122.) Libson testified that he initially believed the document was a search warrant from a judge. (T. 20.) Prompted either by his discovery that the agents did not have a warrant (T. 21), or because he was concerned by the entry of additional federal agents who arrived at or near the same time and entered the apartment in a group, Libson revoked his consent to the search for immigration documents by scratching out his signature on the form. (T. 21, 124-25.) Agent Hart explained that he, Hart, wanted

only Libson's travel documents, and Libson undertook to search for them on his own. (T. 126.) Thirty minutes later, Libson had not yet located the documents. Hart again asked Libson's permission to search the apartment, offering him the right to accompany agents as they performed the search. (T. 153.) This time, Libson consented. (T. 127, 148.) Agent Hart located Libson's passport within minutes, tucked between the box spring and mattress on his bed. (T. 128.)

In the meantime, FBI agents who had entered the apartment waited for their own opportunity to question Libson. (T. 164.) Libson testified that the agents initiated a search almost immediately, (T. 50-51), but the agents described their activity as a casual inspection of the relatively compact apartment.[2] (T. 166, 178.) A computer monitor could be seen just inside Libson's bedroom door, (T. 170, 220), and FBI Agent Walker engaged Libson in a conversation about his computer equipment and the counterfeit check scheme. (T. 168-69.) Libson boasted about the capacity of his equipment, pointing out a photograph of his daughter that Libson had taken with a digital camera and reproduced with his own equipment. (T. 170-171, 218.) Libson denied knowledge or involvement with a counterfeit check scheme, but executed a second consent to search form, one that authorized FBI inspection of the hard drives of two computers, electronic media, financial documents, and his vehicle. (T. 176-77, Government Exhibit 5.) Later, Libson signed and initialed FBI property receipt forms,

---

[2] Libson's testimony about the distance from his bedroom door to the front door of his apartment – he described this as approximately equal to the distance from the witness chair to the front door of Courtroom 2119 in the Dirksen Courthouse (T. 41-42) – was implausible.

- 3 -

acknowledging the FBI's seizure of a box of checks, shredded papers, his computers and two printers. (Government Exhibits 6, 7; also identified as Petitioner's Exhibits 3B, 3A.) Agent Walker testified that he explained these forms to Libson and that Libson signed them voluntarily. (T. 177, 181-84.)

Libson testified that he did not know what the "Consent to Search" form was. He claims that agents thrust it before him, insisting that he sign and initial the receipt forms at the same time, without inspecting them. (T. 33-34.) The court does not find this account credible, for several reasons. First, earlier that morning, Libson had signed, but then scratched out his signature on one "Consent to Search" form and had announced that he would not permit agents to search without a warrant, (T. 22, 55, 100), conduct that reflects that Libson did understand this form and understood his right to refuse to sign it. The property receipt forms are in triplicate; had Libson signed the consent form on top of the other documents, one might expect that his signature would have appeared on one of those other forms. (T. 203.) The Consent to Search form bears not only Mr. Libson's signature, but also his initials beside each item to be searched, a fact inconsistent with his claim that agents showed him only the bottom portion of each of the documents as they asked him to sign them. Most importantly, one of the three receipts that Mr. Libson insists were placed before him and signed at the same time on November 7 was not actually signed until November 8, when Mr. Libson was released from INS administrative custody and arrested by the FBI. (T. 230-31.)

- 4 -

## DISCUSSION

Libson argues that the FBI violated his Fourth Amendment rights by illegally entering his apartment and engaging in a warrantless search. The court concludes, however, that the search here was lawful because Libson voluntarily gave consent to it. *See United States v. Scheets*, 188 F.3d 829, 839 (7th Cir. 1999). In reaching this conclusion, the court will assume that after Libson opened the door to Ward and Klimus, several other agents entered his apartment without consent. Even assuming that this second entry was unlawful, Libson's subsequent consent to search was valid unless the agents' conduct rendered the consent involuntary. *See United States v. Valencia*, 913 F.2d 378, 382 (7th Cir. 1990). The presence of several agents at the scene does not by itself require that conclusion, *United States v. Durades*, 929 F.2d 1160, 1166 (7th Cir. 1991) (citing *United States v. Talkington*, 843 F.2d 1041, 1048 (7th Cir. 1988)), and there is no evidence of any other physical or overt coercion. The agents appeared at Libson's home in the daytime, dressed in suits and ties. (T. 214.) Libson himself was not restrained. (T. 61, 66, 131.) Although he testified that the agents refused to permit him to engage in conversation on the telephone, (T. 73-74), the agents themselves recalled that he had several lengthy conversations (T. 130); and it is undisputed that the agents did not refuse to permit him to answer the telephone at all. Libson felt comfortable enough in the presence of the agents to describe his computers' capacity and point out a photograph of his daughter hanging on the wall. Mr. Libson, who speaks and writes well in English (T. 54), signed a Consent to Search form which explicitly informed him of his rights to refuse the search and to terminate it at any

time, rights that Agent Walker explained orally, as well. This record provides no basis for a conclusion that the fruits of the agents' consensual search should be suppressed.

Finally, Defendant Libson argues that the court should quash his arrest and suppress any admissions made by Libson. Libson notes INS Agent Hart's testimony that while he waited for Libson to produce valid immigration documents, Libson was not free to leave. (T. 147.) Because the FBI did not give Libson his *Miranda* warnings until that agency arrested him on November 8 (T. 39-40), Libson argues that use of his statements would violate his Fifth Amendment rights.

Neither party has specifically briefed the issue of whether INS administrative detention constitutes an arrest. The court notes, however, that an individual present in this country on a visa has an obligation to produce his travel documents promptly on request. Libson's failure to do so at Agent Hart's request is an adequate basis for a brief investigative stop, and the subsequent discovery that he is likely present in the United States illegally supported the INS agent's decision to detain him. It is not disputed that *Miranda* warnings were not administered until the following day. Notably, the government has not responded specifically to this argument, perhaps confident that the fruits of the FBI's consensual search will provide all the evidence necessary to convict Mr. Libson. The court itself is uncertain what statements, if any, made by Mr. Libson on November 7 can be deemed incriminating. Assuming such

statements were made, the court concludes the government does not object to the motion to suppress them. His motion to suppress is otherwise denied.

ENTER:

Dated: July 10, 2001

                                        REBECCA R. PALLMEYER
                                        United States District Judge